## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

JOSHUA FUSTON,
Plaintiff

Case No. 1:11-cv-224
Dlott, J.
Litkovitz, M.J.

vs

COMMISSIONER OF
SOCIAL SECURITY,
Defendant

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) terminating plaintiff's

supplemental security income (SSI). This matter is before the Court on plaintiff's Statement of

Errors (Doc. 10), the Commissioner's response in opposition (Doc. 11), and plaintiff's reply

memorandum. (Doc. 12).

### I. Procedural Background

Plaintiff began receiving SSI disability benefits when he was a child. The Commissioner

conducted a continuing disability review when plaintiff reached age 18. Subsequently, plaintiff's

SSI benefits were terminated because under the disability rules for adults he was found to be no

longer disabled; this finding was affirmed upon plaintiff's request for reconsideration. Plaintiff,

through counsel, requested and was granted a de novo hearing before Administrative Law Judge

(ALJ) Gilbert A. Sheard. Plaintiff, plaintiff's father, a medical expert (ME), and a vocational

expert (VE) appeared and testified at the ALJ hearing. On March 24, 2010, the ALJ issued a

decision upholding the Commissioner's decision to terminate plaintiff's SSI benefits. Plaintiff's

request for review by the Appeals Council was denied, making the decision of the ALJ the final

administrative decision of the Commissioner.

## II. Medical and Academic Evidence

The basis for plaintiff's receipt of children's SSI disability benefits is not entirely clear from the record. There is evidence that as a young child plaintiff had been a lead poisoning victim, was considered learning disabled, had a reading impairment combined with a growth impairment, experienced speech delays, and had a borderline IQ. (Tr. 145, 117, 353). Plaintiff's twelfth grade individualized education plan (IEP) in January 2007 show plaintiff was reading at a fourth to fifth grade level and was only able to read 68 words per minute with 100% comprehension, as compared to his peers who read 155 words per minute with twelfth grade reading material. (Tr. 31). Plaintiff was able to write 34 words per minute, in comparison to his peers who wrote 94.5 words per minute on average, showing he struggled with writing, processing and speed. *Id.* When reading twelfth grade level assignments plaintiff struggled with vocabulary, word attack skills, and fluency which greatly affected his comprehension. *Id.*

On June 25, 2007, plaintiff underwent a consultative evaluation with Nicole A. Leisgang, Psy.D., for disability purposes. (Tr. 110-15). Plaintiff denied having symptoms of anxiety, depression, or recent emotional difficulty. (Tr. 110). Dr. Leisgang observed that plaintiff had adequate grooming and hygiene and adequately organized thoughts and receptive language skills, though his phraseology, grammatical structure, and vocabulary suggested low average intelligence. (Tr. 111). Plaintiff appeared somewhat anxious as he maintained limited eye contact and fidgeted with his hands, but he displayed no other autonomic or motoric indications of anxiety. (Tr. 112). Dr. Leisgang found that plaintiff was alert, responsive, and oriented to time, place, and person; had adequate remote recall; had at least marginally adequate abstract

2

reasoning abilities; and possessed limited short-term memory, attention, and concentration skills. *Id.* Dr. Leisgang further noted that plaintiff's judgment was sufficient for him to make decisions regarding his future but that he may have difficulty managing funds due to his limited arithmetic reasoning skills. *Id.* Plaintiff's test results demonstrated a verbal IQ of 77, a performance IQ of 86, and a full scale IQ of 79, indicating that he was currently functioning in the upper end of the borderline range of intelligence, at approximately the eighth percentile for his age group. (Tr. 113). Dr. Leisgang assigned plaintiff a GAF (Global Assessment of Functioning) score of 59.[1] (Tr. 114). Dr. Leisgang opined that plaintiff was mildly impaired in his ability to relate to others, including fellow workers and supervisors; moderately impaired in his abilities to understand, remember, and follow simple instructions; moderately impaired in his abilities to maintain attention, concentration, persistence, and pace; and mildly impaired in his ability to withstand the stress and pressure associated with day-to-day work activity. *Id.*

Non-examining agency psychologist Bonnie L. Katz, Ph.D., completed a mental residual functional capacity (RFC) assessment on July 24, 2007 based on Dr. Leisgang's consultative examination results and plaintiff's school records. (Tr. 116-35). Dr. Katz diagnosed plaintiff with attention deficit hyperactivity disorder (ADHD), inattentive type, and a learning disability. (Tr. 123). Dr. Katz opined that plaintiff was moderately restricted in his activities of daily living; mildly impaired in his abilities to maintain social functioning; moderately impaired in his

---

[1] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev.2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34.

ability to maintain concentration, persistence, or pace; and had experienced no episodes of decompensation. (Tr. 132).

On September 26, 2007, plaintiff underwent a physical examination by Jennifer Wischer Bailey, M.D. (Tr. 136-42). All examination results were normal. (Tr. 138).

Non-examining state agency psychologist, Alice L. Chambley, Psy.D., completed a psychiatric review technique in October 2007 and diagnosed plaintiff with ADHD, inattentive type, and a learning disability. (Tr. 146-63). Dr. Chambley's opinions were based on plaintiff's school records and Dr. Leisgang's consultative examination. (Tr. 162). Dr. Chambley opined that plaintiff was mildly limited in his activities of daily living and ability to maintain social functioning; moderately limited in his abilities to maintain concentration, persistence, or pace; and had no episodes of decompensation. (Tr. 156). Dr. Chambley further opined that plaintiff was capable of performing routine activities in a familiar setting with few changes and without strict production standards. (Tr. 162).

In January 2009, plaintiff underwent a psychological examination with Kenneth J. Manges, Ph.D. (Tr. 165-71). Following the examination and a review of plaintiff's social security records and the results of an August 2000 psychological evaluation, Dr. Manges determined that plaintiff had a verbal IQ score of 83, a performance IQ score of 89, and a full scale IQ score of 85 on the Wechsler Adult Intelligence Scale-III (WAIS-III), demonstrating low average intellectual functioning. (Tr. 165, 169). Test results further demonstrated that plaintiff had fourth grade reading skills, third grade writing skills, and fifth grade mathematics skills. (Tr. 170). Dr. Manges opined that plaintiff had a low average/borderline IQ and was markedly impaired in his abilities to perform a routine work day, deal with work stresses, maintain

4

attention and concentration, and persist at a work-like task. (Tr. 170-71). Accordingly, Dr. Manges opined that plaintiff had a 95 percent vocational disability. (Tr. 170).

Treatment records from Clermont Counseling Center (CCC) show plaintiff received treatment for depression from February 2009 to July 2009. (Tr. 203-248). Plaintiff was diagnosed with moderate, recurrent major depression, and rule out developmental and bipolar disorders. (Tr. 246).

On July 22, 2009, Baltazar Anaya, M.D., the psychiatrist overseeing plaintiff's treatment at CCC, completed a psychological impairment report. (Tr. 250-56). Dr. Anaya noted that plaintiff exhibited symptoms of depression, such as decreased energy and difficulty with concentration, but opined that he had experienced a slight improvement with treatment, though this prognosis was guarded. (Tr. 252, 255).

Mary Buban, M.D., testified at the January 4, 2010 ALJ hearing as a ME and based upon a review of the entire medical record and hearing plaintiff's and plaintiff's father's testimony, opined that plaintiff was semi-literate, reading between a fifth and sixth grade level. (Tr. 362-63). Dr. Buban further testified that plaintiff would not meet the criteria for Listing 12.05 for mental retardation because the record demonstrated that plaintiff's IQ results have been in the low-average to high-borderline ranges. (Tr. 363). Dr. Buban noted that plaintiff had been diagnosed with ADHD but was not medicated for it, though he did receive anti-depressant medication due to his major depressive disorder diagnosis. *Id.* Dr. Buban testified that the medical record substantiated that plaintiff had some challenges with distractibility and irritability, but that the treatment notes did not support Dr. Anaya's notation that plaintiff had suicidal thoughts given the demonstrated success of medication on plaintiff's depressive

5

symptoms. (Tr. 364-65). Dr. Buban further testified that Dr. Manges' opinion that plaintiff had marked restrictions was unsupported by the record as a whole. (Tr. 365-67).

Dr. Buban opined that plaintiff would be capable of performing substantial gainful activity with the following restrictions: not being closely supervised once he has learned the job skills; being instructed verbally as to his duties, along with being provided written instructions; and having only occasional contact with the general public. (Tr. 368-73). Dr. Buban further opined that plaintiff had the residual functional capacity (RFC) for a full range of work with the following limitations: he cannot understand, remember and carry out complex job instructions; the job must be routine and repetitive, be far enough from others to reduce distractions, not require intense focused attention until scheduled breaks, and have no assembly line type work which forces an inflexible pace; he cannot work as part of a close-knit work team, but must be doing his own work in his own station; there may be people around but he must just be doing his own thing; he should not be given a job requiring independent judgment due to his difficulty making work-related decisions, setting realistic goals, making independent plans, and using judgment on the job as distinct from a job which is routine and repetitive; due to difficulties responding appropriately to changes in the work setting he should have a job without frequent changes; he cannot work in highly stressful jobs; and he should not be given a job which would be a serious challenge to a person with his education and vocational background due to his low self esteem and lack of confidence. (Tr. 313-14).

### III. Analysis

#### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable

physical or mental impairment that can be expected to result in death or that has lasted or can be

expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(B).

The impairment must render the claimant unable to engage in the work previously performed or

in any other substantial gainful employment that exists in the national economy. *Id.*

Regulations promulgated by the Commissioner establish a five-step sequential evaluation

process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.*; *Wilson* v. *Comm'r of Soc. Sec.,* 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th

Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The claimant attained age 18 [i]n . . . 2007 and was eligible for supplemental security
> income benefits as a child for the month preceding the month in which he attained age
> 18. The claimant was notified that he was no longer disabled as of July 1, 2007, based on
> a redetermination of disability under the rules for adults who file new applications.
>
> 2. Since July 1, 2007, the claimant has had the following severe impairment: learning
> disorder (20 C.F.R. 416.920(c)).
>
> 3. Since July 1, 2007, the claimant did not have an impairment or combination of
> impairments that meets or medically equals one of the listed impairments in 20 C.F.R.
> Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926).
>
> 4. After careful consideration of the entire record, the [ALJ] finds that since July 1, 2007,
> the claimant has the residual functional capacity to perform a full range of work at all
> exertional levels but with the following nonexertional limitations: He cannot understand,
> remember and carry out complex job instructions. Due to difficulties maintaining
> attention and concentration and pace for extended periods, the job must be routine and
> repetitive, and be far enough from others to reduce distractions, and not require intense
> focused attention until the next scheduled break, and have no assembly line type of work
> which forces an inflexible pace. Due to difficulties with co-workers, he cannot work as
> part of a close-knit work team, but must be doing his own work in his own work station;
> there will be other people around, but he must just be doing his own thing. He has
> difficulty making work-related decisions, setting realistic goals, making independent
> plans, and using judgment on the job as distinct from a job which is routine and
> repetitive, so do not give him a job that requires such independent judgment. He cannot
> work directly with the general public, occasional contact is okay. Due to difficulties with
> supervisors, he cannot have a job which is normally closely and intensely supervised after
> he first learns the job. Due to difficulties responding appropriately to changes in the
> work setting, give him a job which does not change frequently. The job itself must be
> inherently not highly stressful. Due to his low self esteem and lack of confidence, do not

8

give him a job which would be a serious challenge to a person with his education and vocational background. He has an I.Q. of average to low average borderline for timed tasks, speed. Verbal 88, Performance 89, Full Scale 85 and a less than average memory. For this reason do not give him complex or abstract work. He has a 5th grade reading level, a 5th grade arithmetic level, and [ ] pair oral instruction with written material. Oral instruction is preferred for learning the task so avoid jobs needing higher levels of these skills.

5. The claimant has no past relevant work (20 C.F.R. 416.965).

6. The claimant was born [i]n . . . 1989 and is a younger individual age 18-44 (20 C.F.R. 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. 416.968).

9. Since July 1, 2007, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant's disability ended on July 1, 2007, and the claimant has not become disabled again since that date (20 C.F.R. 416.987(e) and 20 C.F.R. 416.920(g)).

(Tr. 13-21).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545–46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

On appeal, plaintiff argues that: (1) the ALJ erred in discounting the medical opinion of Dr. Anaya, plaintiff's treating psychiatrist; (2) the ALJ erred in dismissing the opinion of examining psychiatrist Dr. Manges; (3) the ALJ improperly discounted the CCC treatment records completed by plaintiff's counselors and therapists; (4) the ALJ's inclusion of boilerplate

10

language in lieu of proper analysis is erroneous; and (5) the ALJ erred in relying upon testimony of the vocational expert.

1. The ALJ erred in discounting the opinion of plaintiff's treating psychiatrist.

Plaintiff asserts that the ALJ erroneously discounted the opinion of Dr. Anaya, his treating psychiatrist, while improperly crediting the opinion of the testifying ME, Dr. Buban. Plaintiff argues that, as his treating psychiatrist, Dr. Anaya's opinion should have been given controlling, or at least greater weight, than the opinion of the non-examining ME. Plaintiff further contends that Dr. Anaya's opinion demonstrated that he meets the criteria for Listing 12.04 due to his depressive disorder, citing to the July 22, 2009 evaluation (Tr. 254-56) in which Dr. Anaya noted that plaintiff's subjective reports supported findings that his depression: restricts his daily activities; causes marked differences in maintaining social functioning; causes deficiencies in concentration and persistence resulting in frequent failure to complete tasks; and has caused repeated episodes of deterioration or decompensation. Plaintiff also argues that the ALJ gave invalid reasons for rejecting Dr. Anaya's opinion and that the treating physician rule mandates that this Court overrule the ALJ's decision and award benefits.

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a

11

treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Kinsella v. Schweiker,* 708 F.2d 1058, 1060 (6th Cir. 1983). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Blakley,* 581 F.3d at 406; *Wilson,* 378 F.3d at 544. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala,* 40 F.3d 789, 794 (6th Cir. 1994).

The treating physician rule mandates that the ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Cole v. Astrue,* 661 F.3d 931, 937 (6th Cir. 2011) (citing former 20 C.F.R. § 404.1527(d)(2)).[1] If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. §§ 404.1527(c)(2)-(6) and 416.927(c)(2)-(6) in determining what weight to give the opinion. *Wilson,* 378 F.3d at 544.

---

[1] Title 20 C.F.R. §§ 404.1527 and 416.927 were amended effective March 26, 2012. The provisions governing the weight to be afforded a medical opinion were previously found at §§ 404.1527(d) and 416.927(d).

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citing former 20 C.F.R. §404.1527(d)(2)). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (citing SSR 96-2p).

Dr. Anaya treated and oversaw plaintiff's treatment at CCC from February 26, 2009 to July 10, 2009. (Tr. 250). Dr. Anaya diagnosed plaintiff with "major depression – recurrent – moderate" and reported that his depression was manifested by: anhedonia,[2] psychomotor retardation, decreased energy, feelings of guilt and worthlessness, suicidal thoughts, and difficulty concentrating or thinking. (Tr. 250, 252). Dr. Anaya opined that plaintiff's depression: (1) restricted plaintiff's daily activities; (2) caused marked "differences" in plaintiff's maintaining social functioning; (3) caused deficiencies in plaintiff's concentration and persistence; and (4) caused repeated episodes of deterioration or decompensation in work or work-like situations. (Tr. 254). Dr. Anaya further noted that plaintiff lived in a highly structured and supportive setting, explaining that plaintiff requires assistance from his parents to manage money, to wake up in the morning, and with spelling and learning activities. (Tr. 255).

The ALJ gave five bases for rejecting the opinions contained in Dr. Anaya's report: (1) the report consists of a form that was not created by Dr. Anaya; (2) there is no medical evidence

---

[2] Anhedonia is "a psychological condition characterized by inability to experience pleasure in normally pleasurable acts." Merriam-Webster Dictionary, *available at* http://www.merriam-webster.com/dictionary/anhedonia (last visited Apr. 3, 2012).

of record that adequately supports his conclusions; (3) the report is largely a recitation of plaintiff's subjective complaints; (4) Dr. Anaya circled "suicidal thoughts" as one of plaintiff's depressive symptoms but the record evidence does not support this conclusion; and (5) the ME, Dr. Buban, opined that plaintiff does not have the level of impairments listed in the report.

The ALJ's stated justifications for rejecting Dr. Anaya's medical opinion do not comport with his duty to provide "good reasons" supported by the record for giving no weight to the treating psychiatrist's opinion. *See Cole*, 661 F.3d at 937. First, the ALJ rejected the treating psychiatrist's opinion because Dr. Anaya signed a report "prepared by his assistant."[3] (Tr. 18). The fact that the report was completed on a form not created by Dr. Anaya is irrelevant with respect to the weight it should be afforded. The ALJ's emphasis on the origination point of the form, quite literally, puts form before substance. The only relevant factors in weighing Dr. Anaya's medical opinions are those enunciated in 20 C.F.R. § 416.1527, such as the nature of the treatment relationship and the evidence supporting the opinion. Accordingly, the fact that Dr. Anaya's opinion was contained on a form he did not generate is not a "good reason" for discounting his opinion. *See Blakley*, 581 F.3d at 406-07 (citing former 20 C.F.R. § 404.1527(d)(2); Social Security Ruling 96-2p, 1996 WL 374188, at *5; *Wilson*, 378 F.3d at 544).

The ALJ's second reason for rejecting Dr. Anaya's opinion is that "there are no medical records from Dr. Anaya or any other treating source that adequately support his conclusions." (Tr. 18-19). The ALJ failed to provide any explanation for this sweeping statement in his

---

[3] The ALJ's statement is an implicitly recognition that Dr. Anaya worked in conjunction with the therapist at CCC who provided counseling services to plaintiff.

14

decision showing how the medical evidence fails to support Dr. Anaya's opinions. The ALJ's failure to adequately explain the reasons for the weight given a treating physician's opinion "*denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record." *Blakley*, 581 F.3d at 407 (emphasis in the original) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007)).

Moreover, the record contradicts the ALJ's finding as treatment notes from CCC and plaintiff's therapists appear to support Dr. Anaya's opinion that plaintiff suffers from a major depressive disorder which severely limits his ability to function from a mental standpoint. *See* Tr. 213, 217, 218, 245 (CCC treatment notes indicate that plaintiff experienced suicidal thoughts and thoughts of "hating" himself); Tr. 214-15, 218, 243 (plaintiff reported ongoing difficulty sleeping); Tr. 219 (mental status exam showed dysthymic (depressed) mood, constricted affect, poor to fair insight, fair judgment); Tr. 210, 224 (low self-esteem); Tr. 218 (isolates self); Tr. 218, 242 (low energy level); Tr. 218, 220, 242 (low motivation); Tr. 222 (incomplete memory of past events); Tr. 242 (lack of interests); Tr. 229 (racing thoughts); Tr. 218, 242 (anger, aggression and easily irritated); Tr. 243 (depressed); Tr. 244 (slow thought content, tangential thought processes at times, slow speech, dishevelled appearance). Consistent with the treatment notes, Dr. Anaya reported that plaintiff displayed the following symptoms of depressions: anhedonia, decreased energy, feelings of guilt, feelings of worthlessness, psychomotor retardation; suicidal thoughts, and difficulty concentrating or thinking. (Tr. 252). Dr. Anaya's finding that plaintiff suffers from marked restrictions in social functioning and in maintaining concentration, persistence, or pace is supported by CCC treatment notes documenting plaintiff's

15

recurrent anger issues and outbursts. (Tr. 218, 227, 237, 242, 244). Dr. Anaya's report that plaintiff needs help from his parents to manage money, wake up in the morning, and with spelling and learning (Tr. 255) is supported by a CCC diagnostic assessment showing limitations on activities of daily living, including an inability to pay his own bills, confusion at the grocery store, inability to call agencies for access to services due to confusion, and need for his parents to maintain an appointment schedule to ensure compliance with appointments. (Tr. 238).

Other record evidence lends further support for the limitations imposed by Dr. Anaya. *See* Tr. 47 (high school records documenting plaintiff's consistent lack of energy); Tr. 72, 74 (plaintiff's tutor reported that plaintiff had very serious concentration problems and very little physical and mental energy); Tr. 112-13 (Dr. Leisgang found plaintiff had limited energy, was easily distracted, had weak attention and concentration skills, and had poor sleep); Tr. 145 (plaintiff's teacher described him as having "very little physical energy"). Record evidence also documents plaintiff's history of difficulty maintaining attention and concentration. *See* Tr. 112 (Dr. Leisgang opined that plaintiff had limited short-term memory, attention, and concentration skills); Tr. 170 (Dr. Manges opined that plaintiff was markedly limited in his ability to maintain attention and concentration). The record further demonstrates that plaintiff continues to live at home and relies heavily on his parents for financial support and with assistance in daily activities. *See* Tr. 62, 90 (plaintiff reported that he needs reminders to take his medication and that his mother cooks his meals); Tr. 64 (plaintiff's parents pay all household bills); Tr. 115 (Dr. Leisgang opined that plaintiff would not be able to manage his own benefits).

16

In light of the evidence of record, the ALJ's rejection of Dr. Anaya's opinion on the ground that his opinion is not supported by other medical evidence is not substantially supported. The ALJ discarded Dr. Anaya's opinion without identifying any contradictory evidence or explaining what findings were unsupported. To facilitate meaningful judicial review the ALJ must state the evidence considered which supports his conclusion and also give some indication of the evidence rejected. *Hurst v. Sec'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985). *See also Shelman*, 821 F.2d at 321. Here, the ALJ failed to provide the necessary support for his conclusory rejection of Dr. Anaya's opinion.

The ALJ further rejected Dr. Anaya's findings because they were based primarily on plaintiff's subjective reports and were not substantiated by any medical or clinical evidence. Although Dr. Anaya referenced plaintiff's subjective reports[4] in identifying plaintiff's limitations in particular work-related activities, the ALJ's conclusion ignores the fact that Dr. Anaya's opinion was also based on his oversight of plaintiff's treatment at CCC and the treatment notes discussed above. Dr. Anaya did not merely credit plaintiff's statements without evaluating them; rather, his opinion was also informed by approximately four months of plaintiff's mental health treatment at CCC. Further, as noted by the Sixth Circuit,

> [w]hile the regulations do require that there be observable evidence other than symptoms, they also allow diagnoses that are based on "medically acceptable clinical diagnostic techniques." In the context of psychological or psychiatric exams, these standards, if strictly applied, would be difficult to reconcile since mental health professionals commonly rely on patient interviews. Psychological

---

[4] For example, in support of his opinion that plaintiff's depressive symptoms cause marked differences in maintaining social functioning, Dr. Anaya wrote "[c]lient reports that he will 'blow up' and curse, throw/kick things and finds it difficult to prevent the angry outbursts. Client reports this has impaired his relationships." (Tr. 254).

examinations can support a claimant's testimony within the meaning of the regulations if the examinations employ medically acceptable diagnostic techniques.

*Taylor v. Sec'y of H.H.S.*, No. 89-1319, 1989 WL 153548, at *4 (6th Cir. Dec. 20, 1989).

Neither the ALJ nor the Commissioner have asserted that the techniques used by Dr. Anaya or the CCC counselors were unacceptable. Consequently, "there is no reason to reject the examinations as unprofessional or to conclude that the [Dr. Anaya] relied solely on [plaintiff's] statements of [his] feelings rather than making an objective evaluation." *Id.*

Moreover, the ALJ incorrectly stated that the record contains no evidence supporting Dr. Anaya's notation that plaintiff has exhibited suicidal thoughts. In a September 1, 2007 Function Report, plaintiff's father noted that plaintiff had talked about hurting himself (Tr. 94); plaintiff twice reported to CCC counselors that he had thoughts of self-harm and/or suicide (Tr. 213, 245); and at the ALJ hearing, plaintiff testified that he "had really bad suicidal thoughts." (Tr. 326). The ALJ's finding in this regard is clearly contradicted by this evidence and, consequently, his reason for rejecting Dr. Anaya's opinion is without substantial support in the record.

The fifth and final basis cited by the ALJ for discounting Dr. Anaya's opinion – that the ME, Dr. Buban, "specifically and correctly stated that the claimant does not have the level of impairments listed [by Dr. Anaya]" - is similarly lacking. *See* Tr. 19. At the hearing, Dr. Buban testified that she had a problem with Dr. Anaya's finding that plaintiff experienced suicidal thoughts based on treatment notes indicating that he had experienced some suicidal thoughts when he started his Zoloft prescription, but that they had subsided. (Tr. 364-65). Dr. Buban

18

further testified that she did not see the "level of impairment documented in the records[,]" but that she did find distractibility and irritability and did "think [plaintiff] has some, you know, some challenges." (Tr. 365).

Medical expert testimony consistent with the evidence of record can constitute substantial evidence to support the Commissioner's decision. *See Barker*, 40 F.3d at 794-95; *Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 570 (6th Cir. 1989). "A non-examining physician's opinion may be accepted over that of an examining physician when the non-examining physician clearly states the reasons that his opinions differ from those of the examining physicians." *Lyons v. Social Security Admin.*, 19 F. App'x 294, 302 (6th Cir. 2001) (citing *Barker*, 40 F.3d at 794) (ALJ was entitled to accept non-examining medical advisor's opinion as to the severity of the plaintiff's impairments where, to the extent the medical advisor's conclusions differed from those of the examining psychologist, the medical advisor explained his position by reference to the objective medical and psychological reports in the plaintiff's file, as well as the undisputed facts concerning the plaintiff's prior work and social history).

In the instant case, Dr. Buban testified that she did not "see that particular level of impairment documented in the records" (Tr. 365), but never explained the basis for her conclusion. The Court cannot discern what medical evidence Dr. Buban expected to see which would indicate a greater level of severity than what she saw or why the treatment records and findings discussed above did not rise to the necessary level of severity. Without some indication of the medical findings upon which Dr. Buban relied, the Court is left without a sufficient basis to review the adequacy of her testimony. Further, the ME's testimony that plaintiff no longer

experienced suicidal thoughts is belied by plaintiff's testimony that he continued to experience

suicidal thought, but with less severity than before. (Tr. 326). Finally, the ALJ accepted the

ME's testimony over the opinion of plaintiff's treating psychiatrist despite the fact that the ME

had never examined plaintiff or interviewed him and despite his duty to afford greater weight to

Dr. Anaya under the regulations. *See* 20 C.F.R. § 416.927(c), (e). For these reasons, the ALJ's

decision to reject Dr. Anaya's opinion based on the ME's testimony is not substantially

supported by the record.

 As the ALJ failed to give good reasons for rejecting Dr. Anaya's opinion, plaintiff's first

assignment of error should be sustained.

 2. The ALJ erred in discounting the opinion of examining psychiatrist Dr. Manges.

 For his second assignment of error, plaintiff asserts that the ALJ erroneously rejected

the opinion of Dr. Manges, an examining psychologist. Dr. Manges opined that plaintiff's

intelligence and functioning levels would preclude work. Plaintiff contends that the ALJ's

almost exclusive reliance on the opinion of Dr. Buban, the medical advisor who testified at the

hearing, is misplaced given that her opinion was based on a review of the records and not an

examination or diagnostic testing such as that performed by Dr. Manges. For the following

reasons, the Court recommends that plaintiff's second assignment of error be sustained.

 The opinion of a non-treating but examining source is generally entitled to more weight

than the opinion of a source who has not examined the claimant. *Ealy v. Commissioner of Soc.*

*Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (citing former 20 C.F.R. § 404.1527(d)(1); *Smith v.*

*Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). When deciding the weight to give a

non-treating source's opinion, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6). Because a non-examining source has no examining or treating relationship with the claimant, the weight to be afforded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for his opinions and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).

The ALJ provided the following reasons for rejecting Dr. Manges' report: (1) because Dr. Manges was retained specifically to document plaintiff's alleged disability, his opinion is not independent; (2) his report is internally inconsistent insofar as his testing demonstrated that plaintiff had a full-scale IQ of 85 (indicating low average intelligence) but Dr. Manges categorized plaintiff as "borderline to low average" intelligence; (3) Dr. Manges' opinion was created "in a vacuum" as he did not have any ongoing treatment relationship with plaintiff and only reviewed a portion of the record; and (4) the ME testified that Dr. Manges' findings were exaggerated. As with Dr. Anaya, the ALJ's stated reasons for rejecting Dr. Manges' opinion are not substantially supported by the record evidence. The Court will address each of these stated reasons in turn.

First, the fact that plaintiff retained Dr. Manges for the purpose of supporting his disability claim is an insufficient basis for rejecting his medical opinion. *See Lester v. Chater*,

21

81 F.3d 821, 832 (9th Cir. 1995) ("The purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them."). *But see Redfield v. Comm'r of Soc. Sec.*, 366 F. Supp.2d 489, 496 (E.D. Mich. 2005) (the opinions of consultative physicians hired for purposes of litigation should be given less weight than the opinion of a treating physician) (citing *Jones v. Sec'y of HHS*, 945 F.2d 1365, 1370 n.7 (6th Cir. 1991); *Farris v. Sec'y of HHS*, 773 F.2d 85, 90 (6th Cir. 1985)). Plaintiff's argument on this score is persuasive. If the fact that a doctor is retained for disability purposes is a proper basis for rejecting their opinion there would be no value to having claimants undergo consultative examinations or in having medical experts testifying as their opinions would be automatically subject to rejection simply because they are compensated by the Commissioner. By extension, the opinions of ALJs would similarly be subject to automatic reversal. Clearly, this is not the case and the purpose for which Dr. Manges was retained is irrelevant in determining the weight to give his opinion.

Second, the ALJ further explained his rejection of Dr. Manges' opinion by stating that the doctor "attempted to place [plaintiff] out of a solid low average intelligence level into a 'borderline to low average' intelligence level." (Tr. 19). Essentially, the ALJ found that Dr. Manges' opinion that plaintiff functioned at a borderline to low average intellectual level was internally inconsistent with testing results showing that plaintiff had a full scale IQ score of 85, indicating intellectual functioning in the low average intelligence classification. *See* Tr. 168 (WAIS-III IQ scores within the range of 80 to 89 are classified as low average intelligence while borderline intelligence is indicated by WAIS-III IQ scores of 70 to 79). However, Dr. Manges' opinion was not based solely on the results of the WAIS-III scores - he also reviewed prior

22

medical and disability records and test results, interviewed and examined plaintiff, and administered an academic assessment. Moreover, the WAIS-III results show that plaintiff scored in the low average range in performance and verbal comprehension; in the average range in perceptual organization; and in the borderline range for working memory and processing speed. (Tr. 169). Thus, plaintiff's test results reflect that he functioned at a low average level in some areas and in the borderline level in others. Based on the whole of this objective and clinical evidence, including test results showing that plaintiff's basic skills were at the fourth grade level (Tr. 169-70), Dr. Manges' opinion - that plaintiff's intellectual functioning was slightly below that indicated solely by the WAIS-III score – is supported by testing and other evidence of record. *See also* Tr. 113 (Dr. Leisgang administered an IQ test where plaintiff's full scale score was a 79, which falls within the borderline range).

Third, the ALJ's rejection of the opinion on the grounds that Dr. Manges was "working in a vacuum," relies exclusively on the fact that Dr. Manges did not hear plaintiff read at the hearing or hear testimony about his Boy Scout achievements. *See* Tr. 19. In his decision, the ALJ stated "[i]t would not be possible for an individual who has accomplished all that the [plaintiff] accomplished as a Boy Scout to have the low level of functioning described by Dr. Manges." *Id.*

While, "the extent to which an acceptable medical source is familiar with the other information in [a plaintiff's] case record" is a relevant factor for the ALJ to consider in deciding how much weight to afford a medical opinion, 20 C.F.R. § 416.927(c)(6), Dr. Manges' findings are not inconsistent with plaintiff's accomplishments. Though the ALJ relies heavily on

23

plaintiff's testimony regarding his various merit badges and Eagle Scout honors, his decision does not address the testimony and other evidence of record showing that plaintiff was a member of a troop comprised of boys with disabilities some of whom, like plaintiff, were on IEPs and that plaintiff's feats were dependent on receiving assistance from other troop members and adults. (Tr. 259, 340-49). Plaintiff's father and Scout Master testified that plaintiff and other Scouts needed specialized, individualized support in order to obtain merit badges and explained that:

> [t]hey had to do things four or five times, where a normal kid only had to do it once . . . and you would hope they would remember it until the next meeting. It just took them a lot longer, where I noticed that all of the kids that were sort of on IEP would take them three to four months to do something or start something in summer camp, and couldn't finish it until two or three months later to where some of them could accomplish, or older kids that their age that didn't have the same problems could accomplish these merit badges within a week or two.

(Tr. 354-55). The ALJ's reliance on plaintiff's Scout achievements without addressing their qualified nature indicates that he viewed this information "in a vacuum." The ALJ stated at the hearing that he was an Eagle Scout as well (Tr. 340) and it appears that his findings are based on his own experience and not on the record evidence which clearly demonstrates that plaintiff's Boy Scout experience was modified to accommodate his limitations. In any event, the ALJ's reliance on plaintiff's Scouting record without addressing this highly relevant evidence undermines his decision to reject Dr. Manges' opinion as inconsistent with plaintiff's abilities.

Lastly, the ALJ stated he rejected Dr. Manges' findings because "the medical expert agreed with me, testifying that the markedly limited conclusions made by Dr. Manges are exaggerated." (Tr. 19).

24

"Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not." 20 C.F.R. § 416.927(c)(1). Here, the ALJ gave more weight to the opinion of the ME, whose sole exposure to plaintiff was a review of his file and listening to his testimony, than to Dr. Manges who completed a full psychological examination complete with verifiable objective data. On the other hand, the ME provided a medical opinion as to plaintiff's reading capabilities based on his reading a sample from a Boy Scout handbook at the ALJ hearing. (Tr. 363). One of the factors the ALJ is to evaluate in determining how much weight to give a medical opinion is its supportability. "The more a medical source presents relevant evidence to support an opinion, *particularly medical signs and laboratory findings*, the more weight we will give that opinion." 20 C.F.R. 416.927(c)(3). Despite the objective psychological testing results supporting Dr. Manges' opinion, the ALJ ignored this evidence and opted to give greater weight to Dr. Buban whose opinion was not based on medical evidence or examination, but on plaintiff's ability to read on command from a booklet at the hearing.

"The primary function of a [ME] is to explain medical terms and the findings in medical reports in more complex cases in terms that the [ALJ], who is not a medical professional, may understand." *Converse v. Astrue*, No. 2:08-cv-461, 2009 WL 2382991, at *13 (S.D. Ohio July 29, 2009) (Order adopting Report and Recommendation) (Holschuh J.) (citing *Richardson*, 402 U.S. at 408). The ME is disallowed from conducting any type of mental status examination of the plaintiff during the hearing. HALLEX I-2-6-70 (Sept. 2, 2005).[5] Here, the ME provided a

---

[5] The HALLEX is a procedural manual utilized by the Commissioner "that sets forth safeguards and procedures for these administrative proceedings." *Robinson v. Barnhart*, 124 F. App'x 405, 410 (6th Cir. 2005).

diagnosis as to plaintiff's reading ability based, not on her review of the record or previous clinical examinations, but on his reading "test" at the hearing. This comes precariously close to the disallowed practice of having the ME conduct an examination of the plaintiff at the hearing. Further, to the extent that the ME's opinion is based on plaintiff's testimony, the opinion lacks support from objective and clinical evidence, such as the test results which support Dr. Manges' opinion.

The Court also notes that the ALJ's questioning of Dr. Buban at the hearing evinces his goal of eliciting certain preconceived responses from Dr. Buban before hearing any independent testimony from the medical advisor on Dr. Manges' report. Specifically, the Court finds that the following statement by the ALJ evinces an intent to influence the medical advisor's neutral explanatory role: "Okay. Then we come to your Exhibit 21, that Dr. Mangus (sic) report. *You have anything good to say about it, or shall we – should we just ignore it*?" (Tr. 365) (emphasis added). In a similar vein, the ALJ asked, "Dr Buban, (INAUDIBLE) on Dr. Mangus's report he has a list of marked limitations, *you believe every one of those is exaggerated*?" (Tr. 367) (emphasis added). The ALJ improperly communicated his clear reluctance to accept Dr. Manges' opinion before giving Dr. Buban an opportunity to provide a neutral, unbiased opinion on her view of the evidence.

The ALJ's decision to reject Dr. Manges' findings based on the ME's testimony disregards the tenet of § 416.927, that the supported opinions of examining doctors should be given more weight than those of non-examining sources. Moreover, Dr. Buban's opinion appears to be improperly formed on plaintiff's reading performance at the hearing and the ALJ's

26

leading questions to the medical advisor. For the these reasons, the ALJ's decision to reject Dr. Manges' report and opinion is without substantial support in the record and plaintiff's second assignment of error should be sustained.


### 3. The ALJ improperly discounted the opinions of plaintiff's therapists.

For his third assignment of error, plaintiff contends that the ALJ failed to comply with Social Security regulations when he gave no weight to the opinions contained in the CCC records on the ground that they did not come from an acceptable medical source.[6] Plaintiff asserts that the regulations allow for the consideration of non-medical source opinions, such as counselors and therapists, in determining the severity of an individual's impairment.

The CCC treatment records document plaintiff's medication and include notes from weekly counseling sessions. (Tr. 205, 210-12, 215-17, 220-30). The records also include psychiatric progress notes on plaintiff's mood, anger issues, and reactions to prescribed psychotropic medication (Tr. 213-14) and the Psychiatric Intake Form documents plaintiff's history of depression, prior therapy, and family history of mental health problems. (Tr. 218-19). The CCC Adult Diagnostic Assessment also addresses plaintiff's family mental health history as well as plaintiff's interests, self-reported abilities, and history of depressive and suicidal thoughts. (Tr. 237-39, 244-45). This diagnostic report includes the counselor's

---

[6] The CCC records were completed by counselors and/or therapists Roxanne Huston, CNS, BC, Susannah Coaston, LPC, Penny Middaugh, LISW, and Cheryl Bolender. *See* Tr. 205-48. The record is illegible with respect to Cheryl Bolender's credentials. However, it is determinable that Ms. Bolender is not a medical doctor or doctor of psychology. *See* Tr. 236.

27

recommendations for therapy, an assessment of areas of impairment, and an initial diagnosis of major depressive disorder. (Tr. 242-45).

The ALJ gave a single reason for rejecting the CCC Adult Diagnostic Assessment (Tr. 237-48): it was completed by a social worker or mental therapist and did "not come from an acceptable medical source [and] is given no weight." (Tr. 19). The ALJ's decision does not discuss the substance of the Diagnostic Assessment or the findings contained therein, nor does it address the thirty pages of medical records documenting plaintiff's treatment and counseling at CCC following this assessment. It is true that social workers and mental therapists are not "acceptable medical sources" under the Social Security Regulations, but "other sources." *See* 20 C.F.R. 416.913(d). *See also Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 472 (6th Cir. 2006) (affirming ALJ's determination that a social worker is not an acceptable medical source); *Martinez v. Astrue*, 422 F. App'x 719, 726 (10th Cir. 2011) (licensed professional counselors are not considered acceptable medical sources under 20 C.F.R. § 416.913(a)). However, the ALJ's cursory rejection of the Diagnostic Assessment and complete omission of any evaluation of the treatment notes in his written decision fail to comply with the applicable Social Security Rulings and regulations and deprives this Court of a meaningful basis for judicial review.

Social Security Ruling (SSR) 06–03p[7] provides that the Commissioner will consider all available evidence in an individual's case record, including evidence from "acceptable medical

---

[7] "Social Security Rulings do not have the force and effect of law, but are 'binding on all components of the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and interpretations' adopted by the Commissioner. 20 C.F.R. § 402.35(b)(1). In *Wilson*, 378 F.3d at 549, the court refrained from ruling on whether Social Security Rulings are binding on the Commissioner in the same was as Social Security Regulations, but *assumed* that they are. [The Court] makes the same assumption in this case."

sources" and "other sources." Only "acceptable medical sources" as defined under 20 C.F.R. § 416.913(a) can provide evidence which establishes the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight. *Id.* "Acceptable medical sources" include licensed physicians and licensed or certified psychologists. *Id.* Licensed social workers, therapists, and educational personnel fall in the category of "other sources" who are not "acceptable medical sources." *Id.* Although information from such "other sources" cannot establish the existence of a medically determinable impairment, the information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.* Factors to be considered in evaluating opinions from "other sources" who have seen the claimant in their professional capacities include how long the source has known the individual, how frequently the source has seen the individual, how consistent the opinion of the source is with other evidence, how well the source explains the opinion, and whether the source has a specialty or area of expertise related to the individual's impairment. *Id.; see also Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007). SSR 06-03p further provides that ALJs "should *explain* the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p (emphasis added).

---

*Ferguson,* 628 F.3d at 272 n.1 (emphasis in original).

The Commission acknowledges that the ALJ's rejection of the Diagnostic Assessment solely on the basis that it came from an "other source" may have been "hasty," but argues that any error was harmless because the assessment offers no substantive opinion on plaintiff's functioning. (Doc. 11 at 11). Yet, this argument ignores the import of the Diagnostic Assessment and subsequent mental health treatment plaintiff received based thereon on Dr. Anaya's opinion on plaintiff's functional limitations. The Diagnostic Assessment, CCC therapy notes, and Dr. Anaya's report should have been considered in conjunction with one another in evaluating plaintiff's claim in this case. Instead, the ALJ isolated the Diagnostic Assessment and rejected it for the sole reason that it did not come from an "acceptable medical source."

The ALJ in this case should have discussed the relevant factors of plaintiff's treatment at CCC, including the length and frequency of his treatment, the consistency of these records with other record evidence, and whether the findings are supported and explained. SSR 06-03p. Without this explanation, the Court is unable to follow the ALJ's reasoning for rejecting the CCC treatment records and Diagnostic Assessment. The ALJ's failure to explain his reasons for rejecting the Diagnostic Assessment as required under SSR 06-03p and the exclusion of any reasons for rejecting the CCC treatment records leave the Court without a basis for meaningful judicial review of the ALJ's decision. *See Hurst v. Sec'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (the ALJ's articulation of reasons "for crediting or rejecting particular sources of evidence . . . is absolutely essential for meaningful appellate review."). Plaintiff's third assignment of error should be sustained.

4. The ALJ did not err by using boilerplate language in his decision.

Plaintiff next argues that the ALJ's determination lacked sufficient specificity due to his use of boilerplate language, citing to the following passage from the decision:

> After careful consideration of the evidence, the undersigned finds that the [plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment.

(Tr. 18). Plaintiff cites to *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010), in which the Seventh Circuit held that boilerplate language similar to that quoted above was not sufficiently detailed to provide the reviewing court with the grounds upon which the RFC determination was based.

However, the ALJs in the *Parker* case "failed to mention highly pertinent evidence [and/or] fail[ed] to build a logical bridge between the facts of the case and the outcome." *Id.* at 921. Their determinations were overturned, not for the use of boilerplate language, but because, in addition, the decisions were fundamentally flawed as one ALJ failed to properly consider the cumulative effects of impairments and the other completely ignored pertinent evidence contained in a treating physician's notes. *Id.* at 923-25. These blatant deficiencies are not present in the instant determination.

The Court agrees that the boilerplate language cited by the ALJ is virtually meaningless. Nevertheless, in this case the boilerplate language is followed by a detailed basis for the ALJ's credibility determination and, therefore, a sufficient record exists upon which this Court can determine whether or not the ALJ's determination is supported by substantial evidence. As

31

plaintiff has not cited to any regulatory credibility factors the ALJ failed to consider, the Court declines to find error in the use of this boilerplate language.

    5.  The ALJ erred by relying on the VE's testimony.

For his final assignment of error, plaintiff contends that the ALJ improperly relied on the VE's testimony at Step Five of the sequential evaluation because the VE failed to identify corresponding Dictionary of Occupational Titles (DOT) numbers for the jobs she testified plaintiff could perform. *See* Tr. 374-75. Plaintiff argues that this omission makes it impossible to confirm the VE's testimony that the stated jobs are consistent with plaintiff's RFC. Plaintiff further asserts that it is impossible to verify the VE's claim that these jobs exist in substantial numbers in the local and national economy and, accordingly, the ALJ failed to carry his burden at Step Five of the sequential evaluation. The undersigned finds that the ALJ improperly relied on the VE's testimony, but not for the reasons asserted by plaintiff.

With respect to plaintiff's argument, he has cited to no authority, nor is this Court aware of any, supporting his contention that the VE's failure to relate the corresponding DOT numbers when providing testimony about the jobs an individual is capable of performing requires a reversal and award of benefits. Indeed, case law supports the contrary position "that there is no requirement that a VE provide reference numbers for the jobs he/she identifies." *Creque v. Astrue*, No. 4:10-cv-1528, 2011 WL 4054859, at *7 (N.D. Ohio Aug. 18, 2011) (Report and Recommendation), *adopted*, 2011 WL 4043786 (Sept. 12, 2011) (citing *Holland v. Comm'r of Soc. Sec.*, No. 1:09-cv-240, 2010 WL 3672338, at *18 (S.D. Ohio Mar. 1, 2010) (Report and Recommendation), *adopted*, 2010 WL 3703293 (S.D. Ohio Sept. 16, 2010); *Rich v. Comm'r of*

*Soc. Sec.*, No. 07-13490, 2008 WL 4450285, at *5 (E.D. Mich. Sept. 29, 2008) ("The regulations do not require identification of specific DOT numbers.")).

However, to the extent that the ALJ's RFC assessment improperly disregarded limitations provided by plaintiff's treating and examining physicians, the hypothetical presented to the VE may not properly reflect plaintiff's impairments and/or limitations. Accordingly, the ALJ erred by relying on this vocational testimony to carry his burden at Step 5 of the sequential evaluation process. *See White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 789 (6th Cir. 2009) (ALJ erred in relying on answer to hypothetical question because it simply restated residual functional capacity which did not accurately portray claimant's impairments). Because the ALJ's hypothetical questions failed to accurately portray plaintiff's impairments, the vocational expert's testimony in response thereto does not constitute substantial evidence that plaintiff could perform the work identified by the VE. Therefore, plaintiff's fifth assignment of error should be sustained.

## IV. This matter should be reversed and remanded for further proceedings.

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the Court must consider whether the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or whether the proof of disability is overwhelming. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176.

*See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987).

Plaintiff argues for outright reversal, contending that Dr. Anaya's report establishes plaintiff meets Listing 12.04 for affective disorders (including depressive syndrome). Listing 12.04 requires, *inter alia*, two of the following: marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. While Dr. Anaya reported that plaintiff's major depression restricts his daily activities and causes deficiencies of concentration and persistence, Dr. Anaya did not rate the limitations as "marked." (Tr. 254). In addition, Dr. Anaya opined that plaintiff would have marked "differences" in maintaining social functioning, but it is not entirely clear what he meant by "differences." (Tr. 254). Dr. Anaya did relate that plaintiff's blow-ups and angry outbursts have impaired plaintiff's relationships, but the Court is unable to discern whether this alone is sufficient to meet the requisite level of severity for Listing 12.04. Nor does it appear that plaintiff's angry outbursts on the average of two times per month and the increase in his depressive symptoms when he is asked to read or fill out forms (Tr. 254) qualify as repeated episodes of decompensation of extended duration under Listing 12.04. Thus, the Court cannot conclude that the record clearly establishes plaintiff's entitlement to disability benefits under Listing 12.04.

This matter should be reversed and remanded for further proceedings consistent with this opinion. All essential factual issues have not been resolved in this matter, nor does the current

record adequately establish plaintiff's entitlement to benefits as of the date his children's SSI

disability benefits were terminated. *Faucher,* 17 F.3d at 176. On remand, the ALJ should

properly evaluate the weight afforded to Dr. Anaya and Dr. Manges as set forth in this opinion,

as well as the CCC Diagnostic Assessment and records, and formulate plaintiff's RFC

accordingly. The ALJ must clearly articulate the rationale in support plaintiff's reconsidered

RFC finding, and provide hypothetical questions to the VE that accurately portray plaintiff's

impairments. Finally, if the services of a medical advisor are necessary, the ALJ should elicit

testimony from a medical expert other than Dr. Buban.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **REVERSED** and **REMANDED** for further

proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).


Date: _____4/23/2012_____                    s/Karen L. Litkovitz
                                             Karen L. Litkovitz
                                             United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

JOSHUA FUSTON,
    Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-224
Dlott, J.
Litkovitz, M.J.

### NOTICE REGARDING OBJECTION TO REPORT AND RECOMMENDATION

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

36